IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JASON MARCELLE and CRYSTAL | : | |
| LEGRAND, individually and as | : | |
| Administratrix of the Estate of DAVAIAY | : | CIVIL ACTION |
| LEGRAND, and as parent and natural | : | |
| guardian of SHIANTI LEGRAND and | : | NO. 07-CV-4376 |
| NIJAIRE LEGRAND, minors, | : | |
| | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | |
| | : | |
| CITY OF ALLENTOWN, et al., | : | |
| | : | |
| Defendants | | |

## MEMORANDUM OPINION AND ORDER

GOLDEN, J.                                                          MARCH 30, 2010

On May 30, 2007, two patrol cars from the Allentown, Pennsylvania Police

Department collided with each other in an intersection in Allentown while responding to an

emergency call.   As a result of the collision, a four year old pedestrian bystander was killed and

an adult pedestrian bystander was seriously injured.

On October 17, 2007, Plaintiff Crystal LeGrand ("LeGrand") filed a civil rights

action in her own behalf and as Administratrix of the Estate of Davaiay LeGrand, and as parent

and natural guardian of Shianti LeGrand and Nijaire LeGrand, minors, against the Allentown

Police Department  (the "Police Department"), the City of Allentown (the "City"), Police Officer

Brett M. Guth ("Guth"), the driver of one of the patrol cars, and Police Officer John C.

Buckwalter ("Buckwalter"), the driver of the other patrol car.  In Counts One and Two, LeGrand,

individually and as Administratrix of the Estate of Davaiay Legrand, claims Guth and

Buckwalter, respectively, violated her substantive due process rights under the Fourteenth Amendment. Count Three asserts a <u>Monell</u>[1] claim against the City and the Police Department. Counts Four and Five assert state law negligence claims against Guth and Buckwalter, respectively. Count Seven[2] asserts a claim for negligent infliction of emotional distress against all defendants. In Counts Eight and Nine, Minor-Plaintiffs Shianti LeGrand and Nijaire LeGrand assert claims for negligent infliction of emotional distress against all defendants. On November 15, 2007, the Police Department, the City and Buckwalter filed a Joint Motion to Dismiss the Complaint in its entirety. Guth filed a separate Motion to Dismiss on November 28, 2007.

On March 19, 2008, the Court entered an Order granting in part and denying in part the Motions to Dismiss. Specifically, the Court dismissed the claims against the Police Department in Count III, and the claims against Buckwalter and Guth in their official capacities in Counts I, II, IV, V, VII, VIII and IX. The Court denied the remainder of the Motions with leave to renew in the form of a motion for summary judgment after discovery was completed.

Meanwhile, Plaintiff Jason Marcelle ("Marcelle") filed a separate civil rights suit on October 18, 2007, against the Police Department, the City, Guth and Buckwalter. In Counts One and Two, Marcelle claims that Guth and Buckwalter, respectively violated his substantive due process rights under the Fourteenth Amendment. Count Three asserts a <u>Monell</u> claim against the City and the Police Department. Counts Four and Five assert state law negligence claims against Guth and Buckwalter, respectively. On November 15, 2007, the Police Department, the City and Buckwalter filed a Joint Motion to Dismiss Marcelle's Complaint in its entirety. On

---

[1]<u>Monell v.Dept. of Social Serv.o of N.Y.</u>, 436 U.S. 658 (1978).

[2]There is no Count Six in the <u>LeGrand</u> Complaint.

2

December 18, 2007, Guth filed a separate Motion to Dismiss.

On March 19, 2008, the Court entered an Order granting in part and denying in part the Motion to Dismiss of the Police Department, the City and Buckwalter.  Specifically, the Court dismissed the claims against the Police Department in Count III, dismissed all claims for punitive damages against the municipal Defendants, and dismissed the claims against Buckwalter and Guth in their official capacities in Counts I, II, IV and V.  The Court denied the remainder of the Motions with leave to renew in the form of a motion for summary judgment after discovery is completed.

On April 29, 2008, by Stipulation and Order, the LeGrand and Marcelle actions were consolidated under the caption of Jason Marcelle, et al. v. City of Allentown, et al., No. 07-4376, for purposes of discovery and trial.  Presently before the Court is the Joint Motion of the City and Buckwalter for Summary Judgment and a Motion for Summary Judgment by Guth.  For the reasons that follow, Guth's Motion is granted and the City and Buckwalter's Motion is granted in part and denied in part.

<u>Standard of Review</u>

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c); see also Daldan v.Kmart Corp., 260 F.3d 228, 231-32 (3d Cir. 2001)(quoting Armbruster  v. Unisus Corp., 32 F.3d 768, 777 (3d Cir. 1994) (Internal quotation omitted)).   A factual dispute is "material" if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   A factual dispute is

"genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id. at 249.  The Court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party.  Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint.  See Celotex Corp.v. Catrett, 477 U.S. 317, 324 (1986).  Instead, they must "go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial."  Id. (Internal quotations omitted).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial."  Celotex, 477 U.S. at 322-23.

### The May 30, 2007 Accident

On May 30, 2007, at approximately 8:30 p.m., Guth was in his patrol car patrolling north on Jute Street in Allentown.   See Preliminary Expert Report of Plaintiff's expert on Police policies, customs and practices, Geoffrey P. Alpert ("Alpert").   At 8:35 p.m., Guth heard an alarm tone over his police radio alerting him to an emergency call of a man with a gun who was reportedly threatening people in the parking lot at the Grand Hotel located at Tenth and Linden Streets.  Alpert Rep. at 5; Guth Dep. at  107, 112, 114.  Guth and four other Allentown police officers were dispatched to handle the call.  Alpert Rep. at 5; Guth Dep. at 108-110, 114.  Although they were not expressly dispatched,  additional officers, including Buckwalter,

responded to the call due to its urgent nature.  Alpert Rep. at 5; Buckwalter Dep. at 10.

After receiving the call, Guth activated the emergency lights and siren on his patrol car.  Guth Dep. at 115.  He then proceeded west onto Gordon Street and turned south on Seventh Street because it was a large artery containing three lanes.  Alpert Rep. at  5; Guth Dep. at 115.  In making the turn from Gordon onto Seventh Street, Guth slowed down and went through a red light.  Guth Dep. at 136, 285.

When Guth turned onto Seventh Street, there were no impediments for him to see the light at the intersection one block ahead at Chew Street.  Guth Dep. at 288. Guth was also aware that: 1) other vehicles, including police vehicles, could be crossing the intersection at Seventh and Chew Streets as he approached: 2)  the area of the collision was highly populated with significant pedestrian traffic; and 3) there was a specific risk of injuries or death to pedestrians posed by responding to this call.  Guth Dep. at 288-89, 292-93, 340-41.

As Guth was driving southbound on Seventh Street, approaching the intersection with Chew Street, he momentarily looked down at his mobile data terminal (MDT) to verify whether the address of the call was 046 Linden Street or 406 Linden Street, and also to make sure he was going in the right direction.  Alpert Rep, at 5-6; Guth Dep. at 116, 119.  The MDT in Guth's patrol car that day was a fixed screen with a separate keyboard.  Guth Dep, at 319.  When he looked back up, he saw that the light which controlled his travel at the intersection of Seventh and Chew Streets was red.  Alpert Rep. at  6; Guth Dep. at 116.

At that instant, he observed another car proceeding westbound on Chew Street, which was driven by Buckwalter, with emergency lights and siren activated, crossing his path. Id.  The light which controlled Buckwalter's travel was green.  Id.  Guth tried to brake and

5

swerve, but it was too late and he crashed into Buckwalter's patrol car. Id. Guth's speed at impact was estimated at between 31 and 34 mph. Alpert Rep. at 6 (speed estimate of between 31 and 32 mph); Report of Steven Schorr ("Schorr"), Plaintiffs' accident reconstructionist (speed estimate of 34 mph); Guth Dep. at 117-118 (31 mph at impact); State Police Investigation Report,1 para. 4 (Unit 1, Guth vehicle traveling at approximately 31 mph at impact). The speed limit on Seventh Street is 30 mph. Schorr Rep. at 1.

The crash caused Buckwalter's car to spin through the intersection and onto the sidewalk where it struck Marcelle and LeGrand's decedent. Schorr Rep. at 4. Neither the air bag in Guth's squad car nor the air bag in Buckwalter's squad car deployed. Guth Dep. at 428; Buckwalter Dep. at 76.

The subject of the emergency call was not apprehended at the scene, but was arrested several days later. However, officers responding to the call did recover a Remington 12 Gauge Shot wrapped in a sheet and abandoned behind a garbage can near 10th and Linden Streets.

The City determined that Guth was at fault for the collision. Guth was subsequently dismissed from the Allentown Police Force. Exhibit 8 to LeGrand's Response in Opposition to the City and Buckwalter's Motion for Summary Judgment. In confirming the decision to fire Guth, the Allentown City Council made the following finding:

> Guth should have been acutely aware of the inherent dangers involved in driving on 7th Street, a major thoroughfare in a densely populated neighborhood, with traffic lights governing the flow of traffic at each intersection. Nevertheless, Guth chose to look down at his MDT mid block, taking his eyes of [sic] the roadway and the upcoming intersection long enough to miss the steady red light at the intersection of 7th and Chew Streets. Guth failed to ascertain the status of the traffic signal until immediately before the intersection, giving him insufficient time to stop his patrol vehicle in order to avoid hitting Buckwalter's patrol vehicle, which was lawfully within the intersection.

Id. at 18.

It is undisputed that as of May 30, 2007, the Mayor of the City was authorized to set or adopt policies for all departments, and the Chief of Police, Roger MacLean ("MacLean"), was responsible for implementing these policies within the Police Department. Apart from the Mayor, the Chief of Police was the only person authorized to set or adopt policies for the Allentown Police Department. Further, a majority of the Allentown City Council, acting in their legislative capacity, could adopt ordinances or other legislative enactments which could set or adopt policies for the City, including the Police Department.

On May 30, 2007, the City had in place a Policy Manual which had been adopted on or about January 19, 2005. Affidavit of Assistant Police Chief David Howells, Jr. at ¶ 4. The Policy Manual includes General Order 5-1, which provides policies and procedures for responding in a police vehicle to routine and emergency calls and provides rules for driving a police vehicle, and also includes rules for police vehicle pursuits. Howells Affidavit at ¶ 14.

Section 5.1.02 of General Order 5-1 requires all Department personnel to exercise due regard for the safety of all persons while operating Department vehicles. While Section 3105 of the Pennsylvania Vehicle Code does not require a stop at a red light under emergency circumstances, General Order 5-1 provided that officers were supposed to stop, and Allentown police officers were supposed to follow the more restrictive General Order. Deposition of Assistant Police Chief David Howells, Jr. at 71, 73; Deposition of Assistant Police Chief Ronald Manescu at 9-10.

Guth testified that during an emergency situation, he believed he was allowed to go through a red light only when proceeding with caution and slowing down. Guth Dep. at 131,

7

136.  Buckwalter testified that during an emergency call, in order to proceed "through any kind of stop sign or any kind of traffic signal [an officer has to] either slow or come to a complete stop to make sure that there are no pedestrians or oncoming vehicle traffic."  Buckwalter Dep. at 50.

### The Hiring of Officer Guth

In 2005, the City offered early retirement to its senior officers because the City wanted to replace more costly senior officers with less costly junior officers.   Howells Dep. at 10.  A larger than anticipated group of between 40 and 50 senior police officers resigned from the force.  Howells Dep. at 12.  In addition, the Police Department lost some field training officers ("FTO") who trained new hires and recruits coming from the police academy.  Howells Dep. at 15. As a result, it was "probably true" that the Allentown Police Department hired more new officers in 2006 than it had during Howell's tenure with the Department.  Howells Dep. at 16-17.

On August 15, 2005, Guth applied for employment as a police officer with the City.  Guth's employment application revealed that he had an extensive record of traffic and other violations, including:

A.  Citation for exceeding maximum speed limit by 16 mph (7/01).

B.  Citation for driving 104 miles per hour (9/01).

C.  Citation for driving 87 miles per hour. (10/01).

D.  Citation for driving with a suspended license. (6/02).

E.  Citation for driving 85 mile per hour in a 55 mph zone. (6/02)

F.  Charge for contempt of court. (8/02).

G.  Two citations for speeding at Camp Lejeaune, NC (1997 and 1998).

H.  Arrest for disorderly conduct (6/01).

I.  Citation for operating an uninspected vehicle. (7/01).

Guth Dep. at 238-257.

_____  In addition, on July 21, 2001, Guth was arrested for driving under the influence ("DUI").  Guth Dep. at 246.  Specifically, Guth was found sleeping on the side of the road in his vehicle while under the influence of alcohol.  Guth Dep. at 247.  Guth was admitted to an Accelerated Rehabilitative Disposition Program ("ARD") and his license was suspended for three months.  In fact, one of the speeding offenses cited above (6/02) actually occurred during the time Guth's license was suspended.  Guth Dep. at 252.  Guth successfully completed the ARD program, resulting in the dismissal of the DUI charges.

The Policy Manual provides at General Order 2-1 et seq...for guidelines regarding the Civil Service Police Officer selection and hiring process.  Howells Affidavit at ¶ 6.  The Policy Manual provides policies and procedures for a background investigation for all applicants, as well as a polygraph examination, a medical examination, and a emotional stability/psychological fitness examination.  Howells Affidavit at ¶ 7.  The Policy Manual also provides guidelines for rejection of police applicants with respect to the usage of illegal drugs and particularly provides that any usage of illegal drugs within the past two years of the application shall be grounds for rejection of an applicant.  Howells Affidavit at ¶ 8.

As part of the hiring proces, Guth successfully completed physical tests as well as required psychological and drug tests.  Guth Dep. at 41; Manescu Dep. at 14.  The City conducted a background investigation of Guth prior to his hiring, which included checks of his driving and criminal records and also administered a polygraph examination.  Howells Dep. at 34, 85; Guth Dep. at 41-42.  During Guth's background investigation, it was noted that when

9

questioned about his high school activities, Guth responded that he did not do anything in high school and further stated, "As you can see from my driving record, the only thing I was qualified for was Nascar."  Howells Dep. at 37-38.  During his background investigation, Guth also admitted to past marijuana use and stated that such use "shows the people that use marijuana are risk takers."  Howells Dep. at 39.

Following successful completion of their background checks, applicants for the Police Department were normally interviewed by a committee consisting of the Chief of Police and/or the Assistant Chiefs of Police.  MacLean Dep. at 18-19.  Guth was interviewed by only the Assistant Chiefs of Police because MacLean had a prior commitment at the time of the interview. MacLean Dep. at 19.

 Manescu recalled from the interview that Guth "having that amount of violations over a period of time,  I think had us all concerned."  Manescu Dep. at 15.  Howells admitted that the amount of Guth's driving violations was "unusual" and more than most candidates.  Howells Dep. at 45.

After the interviews were completed, MacLean was made aware that one of the applicants had a driving record with multiple speeding violations and a driving under the influence arrest, but MacLean did not associate this driving history specifically with Guth prior to his hire.  MacLean Dep. at 20-21; 154.  In fact, MacLean did not actually see Guth's driving record until after the May 30, 2007 accident had occurred.  MacLean Dep. at 18.  MacLean testified that an applicant's driving record would be taken into account during the hiring process because "[p]olice officers spend a lot of time driving."  MacLean Dep. at 17.

MacLean discussed the potential hiring with the City of Allentown Solicitor's

Office to receive guidance on whether Guth should be disqualified as a candidate. MacLean Dep. at 25. MacLean was concerned whether the City could hold the traffic violations against a candidate, particularly one with veteran's preference. MacLean Dep. at 25-26. MacLean was also concerned about whether an applicant's speeding violations which were more than four years old could be used to disqualify him from employment, particularly where the applicant was high on the eligibility list. Id. Based on his meeting with Assistant City Solicitor John Marchetto, MacLean was satisfied that Guth should not be disqualified. MacLean Dep. at 28-29. The City ultimately decided not to disqualify Guth from consideration for employment as a police officer because all of the driving violations occurred more than four years prior to his hiring. MacLean Dep. at 21; Howells Dep at 35-36. In doing so, the City elected to follow its two year "look-back" policy for hiring officers with a prior drug history which was that the prior drug offense would not be considered if it occurred more than two years prior to the application. Id; MacLean Dep. at 154. Before Guth's hiring, the City had no limit on the "look back" period when considering an applicant's driving history. Howells Dep. at 37.

Guth was hired as a police officer by the City in April of 2006. After being hired, Guth worked at the desk for the Police Department until the beginning of the next term of the Police Academy. Guth Dep. at 43-44. General Order 2-3 of the Policy Manual provides that "all newly hired Police Officers must complete basic academy training and must then complete the field training program requiring close supervision of field training officers before being released to perform the full duties of a Police Officer." Howells Affidavit at ¶ 10. The Order also provides "for individualized remedial training for any police officer deemed to be deficient by either his supervisors or field training officers." Howells Affidavit at ¶ 11.

The Retention of Officer Guth

In April or May of 2006, Guth was driving to the Allentown Police Academy, when he tailgated a senior officer, Lieutenant Daryl Hendricks ("Hendricks"). Howells Dep. at 82-83; MacLean Dep. at 137. Upon learning that the person who had tailgated him was a newly hired officer, Hendricks advised Guth that the tailgating was inappropriate. Howells Dep. at 83-84; MacLean Dep. at 137-139. Hendricks also lodged an administrative complaint with the Police Department regarding Guth's conduct. Id. An internal investigation was conducted and MacLean issued a written reprimand to Guth which was placed in Guth's personnel file. Id. In the written reprimand to Guth, MacLean characterized Guth's driving as "aggressive" and in a separate letter to Hendricks, Maclean characterized Guth's driving as "reckless." MacLean Dep. at 139. MacLean testified that he did not realize at the time that the subject of Hendrick's complaint was the same person who was the subject of his previous discussions with the City Solicitor's Office. MacLean Dep. at 141-142. MacLean testified that if he had coupled this incident with Guth's prior driving record, he might have taken steps to either call Guth out of the program or put up a red flag to watch Guth more closely. MacLean Dep. at 143.

The Training of Officer Guth

Guth completed 20 weeks of basic training at the Allentown Police Academy as required by the Pennsylvania Municipal Police Officers' Education and Training Commission ("MPOETC"). Affidavit of William Reinik (Reinik Affidavit") at ¶ 8. At the Police Academy, Guth underwent "754 hours plus" of training, including an Emergency Vehicle Operation Control (EVOC) class. Howells Dep. at 41. EVOC training consisted of 32 hours of classroom instruction and eight hours of driving instruction in a vehicle for a total of 40 hours. Reinik

Affidavit at ¶¶ 9-10.  Guth's EVOC class included instruction on the subjects of emergency

driving and the pursuit of motor vehicles.  Reinik Affidavit at ¶¶ 13-18.  Guth also received

training regarding the Pennsylvania Motor Vehicle Code, including instruction on Section 3105

of the Motor Vehicle Code pertaining to the operation of emergency vehicles.  Reinik Affidavit

at ¶ 15.  Instruction was specifically provided regarding entering into intersections during a

pursuit and that the goal of an emergency response is to arrive safely.  Reinik Affidavit at ¶¶ 16,

18.

   Guth testified, however, that he was not trained during his stay at the police

academy "out on the field" as to how to enter an intersection during an emergency operation.

Guth Dep. at 357.  In fact, Guth testified that he was never "put on the streets at all" during his

time at the police academy.  Guth Dep. at 426.

   Guth passed a written test and field test related to driving.  Guth Dep. at 48.  Guth

received the outstanding driving award for his class at the Police Academy as the result of his

performance on the emergency driving test.  Guth Dep. at 50-52; Reinik Affidavit at ¶ 19.

However, the emergency driving test did not include driving through intersections in response to

an emergency call.  Guth Dep. at 50-52.

   After completing the training at the Academy, Guth completed a four-week post-

police academy and pre-filed training program that the Allentown Police Department had

recently expanded from a previous two week program.  Howells Dep. at 42, 94-95; Reinik

Affidavit at ¶¶ 20-21.  The post academy training program was designed to bridge the gap

between graduating from the Police Academy and beginning the field training program, and

included approximately 76 hours of instruction.  Howells Dep. at 91-92.  This post academy

13

training included a course entitled "Accidental Line of Duty Deaths," which included a segment on how to approach and enter intersections safely in emergency mode. Howells Dep. at 95; Reinik Affidavit at ¶¶ 22-27. This segment on accidental line of duty was taken from a previous mandatory continuing education/certification program given in 2005 to all police officers statewide. Howells Dep. at 95.

In 2006, the Allentown Police Department expanded its field training program ("FTO program") from four weeks to sixteen weeks. Howells Dep. at 16. All newly hired officers, including Guth, were required to complete the 16 week program before they were allowed to patrol on the streets alone. Deposition of Edward Fitzsimmons, Allentown Police Officer and one of Guth's FTOs, at 6-7. During the FTO program, the newly hired officer is assigned to a different FTO for each of the first three weeks and then returns to the original FTO for the final week. Howells Dep. at 96-97. Although Guth successfully completed the emergency driving portion of the FTO program, that assessment was based solely on Guth's verbal understanding of emergency driving. Fitzsimmons Dep. at 89. In fact, Guth did not actually perform any emergency driving during the two terms he was assigned to Fitzsimmons. Fitzsimmons Dep. at 89, 95, 96. Guth was instructed to stop before entering an intersection during an emergency. Fitzsimmons Dep. at 39. During his training, Guth never saw a police officer drive through an intersection with a red signal without slowing down. Guth Dep. at 407.

During the course of his FTO program, Guth was also instructed not to look at the MDT while driving. Guth Dep. at 408. Guth testified that he nevertheless observed FTOs occasionally glance at their MDTs while driving, although he could not recall any of his FTOs driving through a red light while looking at their MDTs. Guth Dep. at 123-126, 409.

Fitzsimmons admitted that he would sometimes glance down at his MDT while driving and probably did so when Guth was with him. Fitzsimmons Dep. at 99-101.

The City has no written directives or policies regarding the use of MDTs in police vehicles. Reply of Defendant City of Allentown to Crystal LeGrand's Third Set of Request for Production, Reply No. 1; MacLean Dep. at 156. MacLean considered it a dangerous practice to drive and look at the MDT at the same time. MacLean Dep. at 158. However, MacLean also testified that he was not aware that any FTOs or Allentown police officers looked at their MDTs while driving. Id.

For every day that Guth was on field training status, a daily observation report was required to be produced by the assigned FTO. Fitzsimmons Dep. at 13. Guth's daily observation reports reflected that he responded on a number of occasions in emergency mode while accompanied by a FTO. From the time he entered the FTO program in January of 2007 until approximately April 7, 2007, it was noted on Guth's daily observation reports on 15 separate occasions that he needed to familiarize himself with the streets of Allentown. Manescu Dep. at 46-50. However, it was common knowledge that many police officers were not familiar with all the streets of Allentown, especially those on the South side of the City. MacLean Dep. at 54. Nevertheless, Manescu admitted that an officer driving in an emergency setting who is unfamiliar with the streets creates a greater hazard to the general public. Manescu Dep. at 32; Howells Dep at 58. From April 7, 2007 until the time he finished his FTO training on May 20, 2007, Guth received no further comments about his need to familiarize himself with city streets which lead Manescu to conclude that Guth had overcome the problem. Manescu Dep. at 63-64. Guth was eligible to patrol on his own on May 21, 2007. Guth Dep. at 390-91. The accident which is the

15

subject of this suit occurred nine days later. Guth Dep. at 392. Guth testified that on the day of the accident, he was still familiarizing himself with the streets of Allentown. Guth Dep. at 101-102.

On March 12, 2005, the Allentown Police Department was officially accredited by the Pennsylvania Law Enforcement Accreditation Commission (PLEAC). Howells Affidavit at ¶ 26. The PLEAC program requires a police department to compare its current polices with applicable PLEAC standards, which have been reviewed and approved by PLEAC and the Pennsylvania Chiefs of Police Association Executive Board. Howells Affidavit at ¶¶ 29, 31, 33. The formal assessment for PLEAC accreditation consists of an on-site, two day review of department files designed to ensure that PLEAC standards have been implemented and complied with. The PLEAC accreditation for the Allentown Police Department was renewed on July 12, 2008. Howells Affidavit at ¶ 48.

On November 19, 2005, the Allentown Police Department was recognized by the Commission on Accreditation for Law Enforcement Agencies (CALEA). Howells Affidavit at ¶ 37. During the self-assessment phase, the applicable police department completes a questionnaire and delivers to CALEA proofs of compliance with CALEA standards. Howells Affidavit at ¶ 42. During the on-site assessment, the reviewers review all standards of the police department and verify the department's compliance with all applicable standards. Howells Affidavit at ¶ 43. Both the CALEA recognition and the PLEAC accreditation were in place and in effect on the date of the accident, May 30, 2007. Howells Affidavit at ¶ 47.

Substantive Due Process Claim Against Officer Guth[3]

[3]Plaintiffs have withdrawn their substantive due process claim against Buckwalter.

Substantive due process protects individuals against "arbitrary action of government" that deprives a citizen of life, liberty or property "whether the fault lies in a denial of fundamental procedural fairness...or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998). However, the Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States." Id. at 848. Only government conduct that "shocks the conscience" can give rise to a substantive due process claim. Id. See also Chainey v. Street, 523 F.3d 200, 219 (3d Cir. 2008).

"The exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case," Miller v. City of Phila., 174 F.3d 368, 375 (3d Cir. 1999), and depends in particular on "the extent of which a state actor is required to act under pressure." Sanford v. Stiles, 456 F.3d 298, 301 (3d Cir. 2006). "In a 'hyperpressurized environment,' an intent to cause harm is usually required," while "in cases where deliberation is possible and the officials have the time to make 'unhurried judgments,' deliberate indifference is sufficient." Id. at 309. In the middle ground, or "circumstances involving something less urgent than a 'split-second decision', but more urgent than an 'unhurried judgment,'" there is a mid-level standard that requires great risk of serious harm. Id. at 308 (internal citation omitted). In his Motion for Summary Judgment, Guth argues that his actions the night of May 30, 2007 must be evaluated under an "intent to harm" standard, while the Plaintiffs contend that Guth's actions must be evaluated under the "deliberate indifference" standard.

The Supreme Court has held that "[i]n a high-speed auto chase aimed at apprehending a suspected offender...only a purpose to cause harm unrelated to the legitimate

object of arrest will satisfy the element of arbitrary conduct shocking the conscience for a [substantive] due process violation." Lewis, 523 U.S. at 836. The intent to harm standard also applies "when unforeseen circumstances demand an officer's instant judgment" and "decisions have to be made in haste, under pressure, and frequently without the luxury of a second chance." Id. at 853.

Our Court of Appeals has applied the intent to harm standard set forth in Lewis to high speed chases of a suspect which result in injury to innocent bystanders. Davis v. Township of Hillside, 190 F.3d 167 (3d Cir. 1999). Other Courts of Appeals have applied the intent to harm standard to responses to various emergency calls. See, e.g., Perez v. Unified Gov't of Wyandotte County/Kansas City, Kan., 432 F.3d 1163, 1168 (10th Cir. 2005) (applying intent to harm standard when a firefighter's vehicle collided with a car en route to an emergency call); Terrell v. Larson, 396 F.3d 975, 977-80 (8th Cir. 2005)(en banc) (applying intent to harm standard where police vehicle, in responding to domestic disturbance, ran red light and collided with another vehicle, killing motorist; Carter v. Simpson, 328 F.3d 928, 952 (7th Cir. 2003) ( applying intent to harm standard where back-up squad car, responding to emergency call, drove through intersection in wrong lane and against red light, and collided with civilian motorist). The Seventh Circuit in Simpson further held that the intent to harm standard applies in all cases where officers are responding to an emergency call. Id.

Although Guth was not involved in a high speed chase, there is no dispute that he was responding to an emergency call of a man threatening to shoot people with a gun. Indeed, Buckwalter testified that the call was "very serious" because he could not remember a time when four units were dispatched to a single call. Buckwalter Dep. at 10, 112. Both Guth and

Buckwalter responded to the call with their lights and sirens activated. Therefore, under the weight of the above authority, Guth's conduct must be evaluated under an intent to harm standard. While Guth's actions may be characterized as grossly negligent or reckless and therefore raise an issue of state tort law, there is simply no evidence in the record that Guth intended to harm Marcelle or LeGrand's decedent so as to raise an issue for a substantive due process claim. In fact, there is no evidence that Guth was even aware of the presence of Marcelle or LeGrand's decedent at the scene of the accident. On the contrary, Guth's intent was to perform his job as a law enforcement officer by responding to a call of a man with a gun. There is no evidence that his actions were tainted by an improper or malicious motive. Therefore, the Court finds as a matter of law that Guth did not violate Plaintiffs' substantive due process rights under the Fourteenth Amendment.[4]

Monell Claims Against the City

A municipality may not be held liable under § 1983 for the actions of its agents solely on the basis of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Instead, a municipality may be held liable only if it has a policy or custom that is the "moving force" behind a constitutional violation.[5] Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404. (1997).

---

[4] Alpert opines that Guth acted with "deliberate indifference and a conscience disregard for the rights of others when he entered the intersection at 7th and Chew Streets." Alpert Report at 6. However, as discussed above, the standard to be applied to the actions of Guth is "intent to harm", not "deliberate indifference". Therefore, Alpert's opinion carries no weight with regard to the actions of Guth.

[5] The City argues that if neither Guth nor Buckwalter are liable under § 1983 for a constitutional violation, the City is automatically not liable. In Brown v. Pennsylvania Department of Health Emergency Medical Services Training Institute, 318 F.3d 482, the Third Circuit held that it is indeed possible for a municipality to be held independently liable for a substantive due process violation even when none of its individual employees is liable. The Third Circuit emphasized, however, that there still must be a constitutional violation. Id.

In order to establish 1983 liability against a municipality, Plaintiffs must show that the City acted with deliberate indifference to the Plaintiffs. City of Canton v. Harris, 489 U.S. 378, 388 (1989). Simple or even heightened negligence is not enough. In addition, Plaintiffs must show a "a direct causal link" between the policy and a constitutional violation. Id. at 385.

Plaintiffs' expert cites two alleged instances of deliberate indifference on the part of the City. Specifically, Alpert opines that "the City of Allentown and its Police Department consciously failed to protect its citizens and the public by 1) hiring Mr. Guth as a police officer after knowing about his prior driving record, including his driving behavior during his academy training" and 2) "by not enforcing its customs and policies through training concerning the use of its Mobile Training Terminals." Alpert Report at 7-10.

With regard to the City's hiring decision, the Supreme Court has cautioned that "[c]ases involving constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause. In the broadest sense, every injury is traceable to a hiring decision." Bryan County, 520 U.S. at 415. Courts must be careful not to allow "municipal liability [to] collapse[] into *respondeat superior* liability." Id. "Where the plaintiff alleges that a single hiring decision is the basis for municipal liability, `the connection between the background of the particular applicant and the specific constitutional violation alleged must be strong." Bryan County, 520 U.S. at 412.

"Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the

official's failure to adequately scrutinize the applicant's background constitute 'deliberate indifference." Bryan County, 520 U.S. at 411-412 (1997). Any finding of culpability related to the hiring decision "must depend on a finding that *this* officer was highly likely to inflict the *particular* injury suffered by the plaintiff." Id. (Emphasis in original).

In Bryan County, the Supreme Court held that a police officer's prior guilty pleas to various driving offenses and other misdemeanors including assault and battery, resisting arrest and public drunkenness did not create a plainly obvious consequence that the officer would use excessive force. Id. Plaintiffs argue that, unlike in Bryan County, Guth's prior offenses specifically related to his driving record and that it was Guth's driving which caused the injuries suffered by the Plaintiffs.

Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that a reasonable jury could conclude that it was highly likely that, based on Guth's reckless driving history, he would take his eyes off the road, speed through a red light (General Order 5-1 required police officers responding to emergencies to stop at a red light) and cause injury to pedestrian bystanders. It is undisputed that at the time he applied to the Police Department in 2005, Guth had received a plethora of traffic citations between 1997 and 2002. Six of these citations were for speeding, including one for driving 104 miles per hour. One of the speeding citations even occurred while Guth's license was suspended for a previous DUI arrest.

Moreover this is not a situation where the decision maker simply failed to investigate Guth's background. On the contrary, both Assistant Chiefs Howells and Manescu were consciously aware of and concerned about Guth's record. Manescu testified that, "Obviously, having that amount of violations over a period of time, I think had us all concerned."

Howells admitted that the amount of citations Guth had received were "unusual" and more than most candidates. MacLean testified that he knew of an applicant with multiple driving citations, but did not specifically associate that record with Guth. MacLean testified that driving history is particularly important in hiring police officers because they spend considerable time driving. MacLean even consulted with the City's attorney concerning the hiring of Guth. MacLean knew that Guth had a veteran's preference and a jury could infer that he was concerned that not hiring him might lead to potential legal difficulties for the City. The City decided to hire Guth despite his driving record and even adopted a new "look back" rule for driving violations.

Although all of Guth's driving citations occurred more than four years prior to his application, his aggressive driving inclination once again resurfaced in the tailgating incident at the Police Academy in 2006, MacLean reprimanded Guth for this incident, but unfortunately failed to "connect the dots" that the tailgating incident was caused by the same individual about whom MacLean had previously conferred with the Assistant City Solicitor. Based on this record, a reasonable jury could find the City's actions in hiring Guth despite being beware of his previous driving record and then in retaining him despite the tailgating incident at the Police Academy in 2006 constitute deliberate indifference to the safety of the public, particularly pedestrian bystanders. Indeed, the accident occurred only nine days after Guth was allowed to patrol on his own. The Court also finds that a reasonable jury could find a direct causal link between the City's decision to hire Guth and Guth taking his eyes off the road and speeding through a red light and causing harm to pedestrian bystanders. The Court does not find that the nexus between the act of hiring Guth and the accident at issue is too tenuous to take the issue of causation from the jury.

Turning to Alpert's contention that the City did not adequately train police officers on the use of MDTs, it is undisputed that the City did not have a written policy concerning the use of MDTs. Rather, the City only had some vague verbal policy which, according to MacLean, instructed officers to fold the lid of the MDT down while driving. The officers were supposedly trained on this policy either when an MDT was first installed in their vehicle or when an officer was trained as new recruit. Although Guth testified that he was instructed during his FTO training not to look at the MDT while driving, he further testified that he occasionally observed his FTOs looking at the MDT while driving. Fitzsimmons himself admitted that he would sometimes glance down at his MDT while driving and probably did so when Guth was with him. When pressed during his deposition, MacLean considered it to be a dangerous practice for a police officer to drive and look at the MDT at the same time. However, there is no evidence in the record that MacLean or any other policymaker for the City had any actual knowledge that police officers or FTOs looked at the MDT monitors while driving during an emergency situation. There is also no evidence in the record that any Allentown police officer, other than Officer Guth, had caused a motor vehicle accident as the result of looking at the MTD monitor. Because there is no evidence that the City and/or its policymakers had any knowledge that police officers, including field training officers, were looking at their MDT monitors while driving in general and in responding to emergencies in particular, the Court finds that there is insufficient evidence of "deliberate indifference" with respect to this claim.

### The State Law Negligence Claim Against Officer Buckwalter

Defendant Buckwalter has also moved for summary judgment on the state law negligence claims against him (LeGrand Complaint Count V); (Marcelle Complaint, Count IV).

Under Pennsylvania law, to establish a negligence claim "a plaintiff must prove the

23

following four elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury, and (4) actual damages." <u>Pittsburgh Nat'l Bank v. Perr</u>, 637 A.2d 334, 336 (Pa.Super. 1994).

Based on the record, the Court finds as a matter of law that Buckwalter did not breach a duty owed to Plaintiffs. At the time of the accident, Buckwalter was responding to an emergency call (albeit as a backup) and had activated the lights and siren on his squad car. There is no dispute that at the time Buckwalter approached the intersection at Seventh and Chew, he was facing a green light. Indeed, the City Council determined that Buckwalter had "legally" entered the intersection. While Buckwalter may have been driving slightly over the 25 miles per hour speed limit on Chew Street, he was priviliged to do so in responding to an emergency by Section 3105(3) of the Pennsylvania Vehicle Code. In addition, Buckwalter testified that his vision of motor vehicle traffic on Seventh Street was obstructed by a building on the northeast corner of that intersection and that he had no time to react to avoid the collision.

There is also no evidence in the record including any from Schorr that Buckwalter's actions were the proximate cause of the accident. As a result, the Court will enter judgment in favor of Buckwalter on the Plaintiffs' negligence claims. [6]

An appropriate Order follows.

---

[6] Since the Court finds that Buckwalter was not negligent as a matter of law, it follows that judgment must also be entered in his favor on Minor-Plaintiff's negligent infliction \of emotional distress claims. <u>See</u> <u>Armstrong v. Paoli Mem'l Hosp.</u> 633 A.2d 605, 609 (Pa. Super. 1993).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JASON MARCELLE and CRYSTAL           :
LEGRAND, individually and as         :
Administratrix of the Estate of DAVAIAY :       CIVIL ACTION
LEGRAND, and as parent and natural   :
guardian of SHIANTI LEGRAND and      :       NO. 07-CV-4376
NIJAIRE LEGRAND, minors,             :
                                     :
         Plaintiffs           :
                                     :
   vs.                              :
                                     :
CITY OF ALLENTOWN, et al.,           :
                                     :
         Defendants

---

O R D E R

AND NOW, this 30th day of March, 2010, it is hereby ORDERED that:

The Motion of the Defendant Brett M. Guth for summary judgment is GRANTED.

Judgment is ENTERED in favor of Defendant Brett M. Guth and against Plaintiffs on Count I of the LeGrand Complaint and Count I of the Marcelle Complaint.

The Motion of the Defendants City of Allentown and John C. Buckwalter is GRANTED in part and DENIED in part.

Judgment is ENTERED in favor of Defendant John C. Buckwalter and against the Plaintiffs on Count II of the LeGrand Complaint and Count II of the Marcelle Complaint.

Judgment is ENTERED in favor of the Defendant City of Allentown and against the Plaintiffs on Count III of the LeGrand Complaint and Count III of the Marcelle Complaint only as to the claim that the City of Allentown consciously failed to protect its citizens and the public by not enforcing its customs and policies through training concerning the use of its Mobile Data Terminals.

Judgment is ENTERED in favor of Defendant John C. Buckwalter and against the Plaintiffs on Counts V, VII, VII and IX of the LeGrand Complaint and Count IV of the Marcelle Complaint.

The following counts shall remain :

LeGrand Complaint: Counts III, IV,

Counts VII, VIII, IX against all Defendants except Buckwalter.

Marcelle Complaint: Counts III and IV.


BY THE COURT:


*S/THOMAS M. GOLDEN*
THOMAS M. GOLDEN, J.